J-S57036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LON A. ZORTMAN AND STEVEN R. ZORTMAN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THE BALTIMORE LIFE INSURANCE COMPANY | : | |
| | : | |
| APPEAL OF: LON A. ZORTMAN | : | No. 968 MDA 2019 |

Appeal from the Judgment Entered September 4, 2019
in the Court of Common Pleas of York County
Civil Division at No(s):  2016-SU-3074

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 11, 2020**

Lon Zortman ("Lon") appeals from the Judgment entered in favor of Steven Zortman ("Steven") in the amount of $59,798.71, plus interest and the costs of suit.  After careful review of the record, we affirm.

This matter stems from an annuity agreement between Nancy Zortman ("Nancy"), Lon and Steven's mother, and the Baltimore Life Insurance Company ("BLIC").  In March 2011, a meeting was held at the Zortman home with Nancy, Lon, Steven, and BLIC agents Gerald Rasmus ("Agent Rasmus") and Joe Rodgers ("Agent Rodgers"), for the purpose of acquiring an annuity for Nancy.  At the meeting, the parties discussed Nancy's goals for the annuity, and Agent Rasmus completed the annuity application.  On the application, Agent Rasmus completed the "primary beneficiary" section with Lon's information, and completed the "contingent beneficiary" section with Steven's

information.[1]  Accompanying the annuity application in Nancy's file was a handwritten note, titled "GOALS," wherein Agent Rasmus wrote the following: "Goal is to ensure guaranteed income for life and to pass any remainder to Steve & Lon.  Sons very concerned about nursing home stay and want to make sure mother always has income." (hereinafter, the "Goals Memorandum"). The policy application was submitted to BLIC on March 31, 2011, and the policy was issued on April 20, 2011.  Nancy died on July 30, 2016.

Following Nancy's death, Steven came to understand that Lon was listed as the sole primary beneficiary of the annuity policy, and notified BLIC that he was claiming half of the remainder.  Lon filed a Complaint on November 9, 2016, seeking the full proceeds of the annuity policy as the sole primary beneficiary.  BLIC sought, and was granted, an interpleader, and paid the entire $119,597.42 remainder to the Prothonotary pending the resolution of the dispute.  On February 24, 2017, Steven filed a cross-claim for his half of the proceeds.[2]  A non-jury trial was held on December 11, 2018.

---

[1] The application only provided enough room for one person's information in each section.  N.T., 12/11/18, at 31.

[2] Steven's cross-claim also included other unrelated claims related to Nancy's estate.  By agreement of the parties, all claims concerning the administration of the estate were withdrawn, without prejudice, to be brought at a later date.

After hearing testimony from Lon, Steven, Agent Rodgers, Agent Rasmus, and Steven's son, Jesse ("Jesse"),[3] the trial court made the following findings of fact:

1.      In 2010, after collecting the life insurance proceeds on the life of their father, William R. Zortman[,] for the benefit of [Nancy], the brothers [Steven] and [Lon] jointly decided to use the proceeds to purchase an annuity for [Nancy].

2.      There was a meeting with [Nancy], [Steven], [Lon], and insurance agents [Agent] Rasmus and [Agent] Rodgers.

3.      [Agent] Rasmus[] completed the annuity application for [Nancy], which is in his handwriting.

4.      The application was completed in the presence of [Lon and Steven,] and another agent.

5.      [Agent] Rasmus'[s] [Goals Memorandum] stated that the policy was to "…[ ]ensure guaranteed income for life and to pass any remainder to Steve & Lon."

6.      This note was submitted with the original application[,] which was dated March 31, 2011.

7.      [Agent] Rasmus'[s] understanding was that the goal of [Nancy] was to pass the remainder of the annuity equally to her two sons, Lon and [Steven], and she told him that Lon and [Steven] were to be equal primary beneficiaries.

8.      The way the application was completed by [Agent] Rasmus, [*i.e.*], line 16 indicating Lon as primary beneficiary, and line 17 indicating [Steven] as contingent beneficiary, did not meet the goal and intent of [Nancy] of treating her sons equally.

_____

[3] The testimony reveals that, though Jesse was not a participant to the annuity meeting, he was present in the home while the meeting took place.

9.   The [BLIC] application does not have more than one space for a primary beneficiary.

10.  [Agent] Rasmus made a mistake in filling out the application in the beneficiary section, that was not intended by [Nancy].

11.  [Agent] Rasmus could not remember if he explained to [Nancy] the meaning of primary and contingent beneficiaries.

12.  [Agent] Rasmus did recall saying at this meeting that when [Nancy] received annuity payments, she could make gifts in equal shares to Lon and Steven.

13.  The policy summary that was delivered after the issuance of the policy did not contain a reference to "primary" or "contingent" beneficiary.

14.  [Agent] Rasmus acknowledged that when [Steven] called him after the death of [Nancy], and questioned the primary and contingent beneficiary provisions, he stated that he did not know how that happened, and that he did not recall why it was that way or why it would have ended up that way.

Verdict, 5/13/19, at 2-4.

The trial court, in its decision, credited Agent Rasmus's testimony that Nancy's intent was to leave the remainder of her annuity in equal shares to Lon and Steven, as evidenced by the Goals Memorandum and the lack of room to designate multiple primary beneficiaries on the standard BLIC application form. *Id.* at 6. It also credited Steven's testimony that, in his multiple interactions with her, Nancy made her intent clear that she wished for Lon and Steven to share equally in the proceeds of the policy. *Id.* at 7. While it noted Lon's multiple objections at trial related to the parol evidence rule, it found that a mutual mistake occurred between Nancy, who can longer testify as to

her intent, and Agent Rasmus, in his completion of the annuity application.

*Id.* at 6-7.

The trial court, in its Opinion, made the following conclusions of law:

1.  The parol evidence rule does not preclude testimony showing that, as a result of mutual mistake, a written agreement does not express the true intention of the parties, and that as it stands[,] neither party had assented to it.

2.  A court of equity has the power to reform the written evidence of a contract and make it correspond to the understanding of the parties, and this principle applies to insurance contracts.

3.  Here[,] there was a mutual mistake on the part of Nancy [] and [Agent Rasmus] as to Nancy[]'s intent concerning her beneficiaries.

4.  The mistake on the part of Nancy [] was her belief that her annuity application reflected her expressed wishes of having the beneficiary provisions of the annuity treat her two sons equally.

5.  The mistake of [Agent Rasmus] was filling out the form incorrectly as to not be consistent with the express intent of Nancy [] of having the beneficiary provisions of the annuity treat her two sons equally.

6.  In this case[,] the written [Goals Memorandum,] the testimony of [Agent] Rasmus, and [Steven] provide evidence of a mutual mistake that is clear, precise[,] and convincing.

7.  Accordingly, this [c]ourt has the ability to reform the annuity contract to provide that the primary beneficiaries are Steven [] and Lon[, and] to share the residue of the annuity equally.

*Id.* at 8 (citation omitted).

Following the entry of the Verdict in favor of Steven, Lon filed for post-trial relief, which the trial court denied. Lon filed a Notice of Appeal to this Court on June 12, 2019, and he submitted his court-ordered Rule 1925(b) Concise Statement on July 1, 2019.[4]

On appeal, Lon raises the following questions for our review:

1.  Whether [the trial] court['s] findings 6, 7, 8, 9, 10, 12[,] and 13 are supported by the record[,] or are irrelevant[?]

2.  Whether the [trial c]ourt erroneously[,] as a matter of law[,] concluded that [Steven] met his higher burden to prove a mutual mistake in executing the annuity application by clear and convincing evidence[?]

3.  Whether the [trial c]ourt erroneously concluded [Steven] proved a mutual mistake in completing the annuity application by a preponderance of the evidence[?]

4.  Whether the [trial c]ourt erroneously failed to restrict [Nancy's] intent or state of mind beneficiary declaration to the time of its utterance before completion of the annuity application[?]

5.  Whether the [trial c]ourt erroneously allowed parol and hearsay evidence of [Steven's] witnesses to vary, modify[,] or supersede the annuity application which was part of the written annuity contract[?]

6.  Whether [the trial] court['s] conclusions of law 1, 3, 4, 5, 6[,] and 7 are supported by precedent and clear and convincing evidence[?]

7.  Whether the [trial c]ourt erroneously awarded prejudgment interest against Lon[?]

_____

[4] Judgment was entered on September 4, 2019, at the direction of this Court.

- 6 -

Brief for Appellant at 4-5 (capitalization omitted, renumbered). We will combine Lon's claims into three arguments: (1) Lon's challenges to the trial court's factual findings; (2) Lon's challenges to the trial court's conclusions of law; and (3) Lon's challenge to the trial court's award of prejudgment interest to Steven.

We will first address Lon's argument that the trial court's findings of fact were not supported by clear and convincing evidence. *Id.* at 21. Our standard of review in cases involving a non-jury trial verdict is well established.

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue ... concerns a question of law, our scope of review is plenary.

*Wilson v. Transport Ins. Co.*, 889 A.2d 563, 568 (Pa. Super. 2005) (internal citations and quotations omitted).

At trial, Agent Rasmus and Agent Rodgers both testified concerning the annuity application meeting. Agent Rodgers testified that he had attended the meeting for training purposes with Agent Rasmus. N.T., 12/11/18, at 13. He testified that he could not recall many of the details of the meeting, but he remembered that Agent Rasmus filled out the annuity application, and Nancy signed it. *Id.* at 16-18.

Agent Rasmus testified that he filled out the annuity application materials on behalf of Nancy. *Id.* at 31. He testified that his understanding of Nancy's wishes was that she wished, upon her death, for the remainder of the annuity policy to be split equally between Lon and Steven. *Id.* at 30. Agent Rasmus testified that he wrote the Goals Memorandum, wherein he wrote, "[the g]oal is to ensure guaranteed income for life and to pass any remainder to Steven and Lon … [s]ons very concerned about nursing home state and want to make sure mother always has income." *Id.* at 29. Agent Rasmus testified that, while the Goals Memorandum was not part of the formal policy application, it was prepared in conjunction with the application and was submitted alongside the application as part of Nancy's file. *Id.* at 27-29, 36. As a result, he testified, the annuity application that he had completed and submitted did not reflect what he understood to be Nancy's goal in dividing the remainder of her annuity equally. *Id.* at 31-32.

Steven testified that there was no ambiguity or confusion during the meeting that the intention of the parties was for Steven and Lon to be primary beneficiaries of Nancy's annuity. *Id.* at 73. He testified that he did not hear any discussion concerning Lon being the sole primary beneficiary and him being the contingent beneficiary. *Id.* at 75-76. Lon testified that he did not witness Agent Rasmus filling out the Goals Memorandum during the meeting, but he heard Agent Rasmus explain to Nancy what beneficiaries are, and heard him say "if anything happens to Lon, then Steve[n] will be the beneficiary." *Id.* at 94-95.

The trial court also heard testimony from Jesse. *Id.* at 79. He testified that, while he was not present for the actual meeting, he recalled Nancy telling him earlier in the day that "her money was between Lon and Steve[n,] and was to be split [] equally," and that, in the event that Jesse and his brother ever were in a similar situation, that they should divide monies equally, too. *Id.* at 83.

Finally, the physical evidence presented at trial, including the annuity application, the Goals Memorandum, and the policy documents supplied to Nancy when the policy took effect, all support the trial court's factual findings. As a result, we find ample support in the record and in the testimony considered by the trial court in making its factual findings, and we will not disturb those findings or the trial court's credibility determinations on appellate review.

We will next address Lon's second through sixth issues, in which he challenges the trial court's determination that a mutual mistake had occurred between Nancy and Agent Rasmus when Agent Rasmus completed the annuity application. Brief for Appellant at 14, 17-18, 20. Specifically, Lon argues that Steven failed to meet his burden in proving, by clear and convincing evidence, that a mutual mistake had occurred. *Id.* He points to several instances in the parties' testimony where their respective recollections were imprecise, or where they could not recall specific details from the March 31, 2011 meeting. *Id.* at 15. Lon also argues that, as a result of Steven's failure to present clear

and convincing evidence of a mutual mistake, the trial court erred in allowing testimony in the form of parol evidence. *Id.* at 18-19.

> A court of equity has the power to reform the written evidence of a contract and make it correspond to the understanding of the parties. This principle applies with equal force to insurance contracts. However, the mistake must be mutual to the parties to the contract. Parol evidence is generally admissible for the purpose of showing that, by reason of mutual mistake, a written instrument does not truly express the intention of the parties. However, to warrant the reformation of the terms of a written contract on the grounds of mutual mistake, the evidence must be clear, convincing, and of the most satisfactory character. In fact, in order to obtain the reformation of a contract because of mutual mistake, the moving party is required to show the existence of the mutual mistake by evidence that is clear, precise[,] and convincing. Furthermore, the evidence must be established by two witnesses, or by one witness and corroborating circumstances[.]

*Bugen v. New York Life Ins. Co.*, 184 A.2d 499, 500-01 (Pa. 1962) (citations and paragraph breaks omitted).

Here, the annuity policy was originally applied for on March 31, 2011, following a meeting between the BLIC agents and Nancy, in the presence of Lon and Steven. Agent Rasmus testified regarding his belief that his and Nancy's intention was for Lon and Steven to be joint primary beneficiaries. N.T., 12/11/18, at 32, 51. Agent Rasmus stated that, "[i]f the [annuity] application is submitted with a mistake, that same mistake would translate into the policy issuance." *Id.* at 38. Finally, Agent Rasmus acknowledged that "it's possible [that] I made a mistake" in preparing the annuity application, because he did not believe he had ever previously submitted an application with two primary beneficiaries. *Id.* at 49. Agent Rasmus's

testimony was not disputed by Agent Rodgers, who testified that he did not recall the specific conversation between Agent Rasmus and Nancy regarding the primary and contingent beneficiary sections of the annuity application. *Id.* at 18, 21.

Additionally, Jesse testified that, in his conversation with Nancy earlier in the day, "[Nancy] said [that] her money was between Lon and Steve[n,] and was to be split 50/50 equally." *Id.* at 83. He explained that "[w]e were having a conversation as to why things should be 50/50 amongst brothers," and that if Jesse and his brother "in the future … had anything that needed to be split, she would encourage [them] to do things this way as 50/50." *Id.* at 83-84.

Additionally, Steven testified that the beneficiary provisions "[were] supposed to be equal between [Lon] and myself." *Id.* at 71. He testified that there was no ambiguity or confusion that he and Lon were to be joint primary beneficiaries. *Id.* at 73. According to Steven, there was no discussion about primary versus contingent beneficiaries, and he never heard Agent Rasmus represent to Lon that Lon would be the primary beneficiary and Steven would be contingent. *Id.* at 76.

The record supports the trial court's conclusion that the parties to the annuity contract were mutually mistaken by credible and persuasive evidence. Agent Rasmus and Steven both agreed that the intention of the parties was to record both Steven and Lon jointly as primary beneficiaries, and Jesse testified that Nancy wished for her annuity proceeds to be split equally

- 11 -

between the two brothers. Despite Lon's sole testimony to the contrary,[5] we find that the evidence presented at trial was legally sufficient for Steven to meet his burden in proving that the contract suffered from a mutual mistake in accordance with our Supreme Court's holding in **Bugen**. **See Bugen**, 184 A.2d at 475-76. Accordingly, we conclude that the trial court, after finding a mutual mistake, did not err in reforming the annuity contract to comply with the clear intent of the parties in rendering its verdict.

Finally, Lon argues that the trial court erred in awarding prejudgment interest to Steven. In his appellate brief, he asserts, in his one-sentence argument, that "Lon[]'s claim and Steven['s] crossclaim did not include interest, and the cash refund at death was paid into [c]ourt." Brief for Appellant at 21. At the outset, we note that Lon did not set forth any citation to authority or legal discussion in support of its argument that the trial court erred in awarding prejudgment interest to Steven. Pa.R.A.P. 2119(a) (providing that "[t]he argument shall [have] such discussion and citation of authorities as are deemed pertinent."); **see also Estate of Haiko v. McGinley**, 799 A.2d 155, 161 (Pa. Super. 2002) (holding that an appellant's failure to include citations to relevant authority constitutes waiver of the issue on appeal). As a result, we deem Lon's argument related to the trial court's award of prejudgment interest to be waived. **See id.**

---

[5] We note that, in reviewing Lon's testimony, the trial court "[had] doubts about the credibility of Lon's testimony that it was Nancy[]'s intent to leave the entirety of the proceeds to Lon, and make Steven a contingent beneficiary." Verdict, 5/13/19, at 5.

- 12 -

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/11/2020